THE STATE OF KANSAS, *ex rel. S. B. Bradford, Attorney General,* v. WALTER I. HARWOOD AND E. M. CAMPBELL, *as Members of The Board of Commissioners of Seward County, et al.*

1. COUNTY-SEAT ELECTION; *Canvass of Returns and Declaration of Result, Void.* Under the provisions of the act relating to the organization of new counties, an election was held for township and county officers, and also for the permanent location of the county seat of the county, and certified returns from each precinct were made to the board of county commissioners; on Saturday following the election the county commissioners examined the returns made to them, and canvassed and declared the result for township and county officers; thereupon, one of the commissioners made a motion that the board proceed to canvass the votes to determine the permanent location of the county seat; another member moved that the motion so made be laid upon the table; this was carried, and no announcement of the vote on the county seat was then made; the board then adjourned to Monday, but no hour was fixed for the adjourned meeting, as the majority of the board did not want the friends of the place they intended to declare defeated in the contest for county seat, to be present; on Monday at three o'clock in the morning, by moonlight, and without the official poll-books, ballots, or tally-sheets, two of the members of the board of county commissioners and the county clerk met upon the town site of the temporary county seat, and without

notice to or the presence of the third member of the board, pretended to make a canvass of the votes cast for the county seat, and declared one of the places voted for as the permanent county seat of that county. *Held*, That the alleged canvass of the returns of the election for the county seat, and the declaration of the result, were not only irregular, but wholly invalid.

2. ———— *First Poll, Fraudulently Organized; Second Poll, Rightfully Organized—Votes to be Canvassed.* At the first election to determine the permanent location for the county seat of Seward county, Springfield and Fargo Springs, contested; between forty and fifty voters, favorable to Fargo Springs as the county seat, very early in the morning took possession of the room where the polls had been designated to be opened in Seward township, with the intention of excluding all the friends of Springfield from having anything to do with the selection of the judges and clerks at that precinct; from one to two hundred persons, favorable to the selection of Springfield as the county seat, assembled around the building where the polls were to be opened, as early as eight o'clock; most of them were legal voters, and were present to participate in the selection of the election board; while they were waiting, and before nine o'clock A. M., the outside door of the room opened, and the judges and clerks were elected by the parties within the room, about the time the door opened; voting at that poll immediately commenced; the majority of the voters of that election precinct were upon the outside of the building, but were denied all participation in the organizing of the polls; if they had participated in the organization, they were sufficient to have outvoted those upon the inside of the building; after the voters upon the outside of the building had been refused all participation in the organization of the first poll, and after it was impossible for them to change any members of the election board, and after they had been denied any representation upon the board, they proceeded to select from among themselves, three judges and two clerks for the election, who were duly sworn, and thereupon, at about nine o'clock A. M., they opened a second poll in a wagon which had been drawn up very near to the room originally designated as the place where the polls were to be opened; at the first poll, 139 votes were cast; at the second poll, 265 votes were received: *Held*, That the first poll was irregularly and fraudulently organized; and *further held*, that a majority of the voters assembled at such election precinct had the right, under the circumstances, to organize the second poll, and that the certified returns of such second poll were entitled to be canvassed in determining the permanent location of the county seat.

## Original Proceedings in Mandamus.

ACTION brought in this court August 20, 1886, by *The State of Kansas*, on the relation of the attorney general, against

*Walter I. Harwood* and *E. M. Campbell*, as members of the board of commissioners of Seward county, and *J. M. Wilson*, county clerk of said county, to compel the defendants to duly canvass the returns of the election held in that county on August 5, 1886, for the permanent location of the county seat thereof. The opinion herein, filed at the session of the court in March, 1887, contains a statement of the material facts.

*S. B. Bradford*, attorney general, *Webb & Spencer, D. N. Caldwell*, and *James Lawrence*, for plaintiff.

*Kellogg & Sedgwick, Buck, Feighan & Evans*, and *Milton Brown*, for defendants.

The opinion of the court was delivered by

HORTON, C. J.: This is an action of mandamus to command the defendants to canvass the returns of the election held in Seward county on August 5, 1886, for the permanent location of the county seat, and in making such canvass to reject the votes cast in the "Owl building" in Fargo Springs, and in their place to accept the ballots cast at the poll known as the "wagon-box" in that village.

Seward county was organized June 17, 1886, by the proclamation of the governor. Walter I. Harwood, E. M. Campbell, and E. A. Watson were appointed the temporary commissioners, and J. M. Wilson, the county clerk. These officers qualified and entered upon the discharge of their duties July 3, 1886. Seward county contains sixteen congressional townships and four half congressional townships, being twenty-four miles east and west, and twenty-seven miles north and south. By the proclamation of the governor, the town of Springfield was designated as the temporary county seat. The temporary board of county commissioners, at its meeting, July 3, 1886, divided the county into three municipal townships, as follows: Seward township, being twelve miles north and south, and twenty-four miles long east and west; Liberal township, being twelve miles wide east and west, and fifteen miles long north and south: Cimarron township, with the same extent of territory as Liberal township. The voting

precincts were established in these townships as follows: In Seward township, at Fargo Springs, in the southwest room of the building known as the "Owl building"; in Liberal township, at Rogers's store; in Cimarron township, at a building known as "Tarbox's ranch." The town of Fargo Springs is nearly two and one-half miles south of Springfield. At the time of the election, although Springfield was the temporary county seat, the board of county commissioners, instead of making it a voting precinct, established the precinct of Seward township at Fargo Springs; and yet the bulk of population of Seward township lies nearer Springfield than Fargo Springs. In the division of the county into commissioner districts, each of the three municipal townships was made a district; one of the townships, namely, Cimarron, had 39 votes only, while Liberal township had 132, and Seward township 404. On July 3, 1886, the board of county commissioners ordered an election to be held on August 5, 1886, for the various county and township officers in the county, and for the permanent location of the county seat. The following table shows the votes cast in the several precincts for the permanent location of the county seat:

|  | | Springfield. | Fargo Springs. |
|---|---|---|---|
| Seward township, | Owl building | 3 | 136 |
|  | Wagon-box | 264 | 1 |
| Liberal township | | 28 | 104 |
| Cimarron township | | 4 | 35 |
| Total | | 299 | 276 |

An alleged canvass of the votes was had early Monday morning, August 9, 1886, with the following result:

|  | Springfield. | Fargo Springs. |
|---|---|---|
| Seward township | 3 | 136 |
| Liberal township | 28 | 104 |
| Cimarron township | 4 | 35 |
| Total | 35 | 275 |

It is claimed by the plaintiff that the result of the canvass should have been as follows:

|  | Springfield. | Fargo Springs. |
|---|---|---|
| Seward township | 264 | 1 |
| Liberal township | 28 | 104 |
| Cimarron township | 4 | 35 |
| Total | 296 | 140 |

E. M. Campbell, one of the defendants, testified that the canvass of the votes for county officers was made at Springfield, on August 7th; that the canvass was not completed that day, because the commissioners thought it would be dangerous to do so on account of the excitement and threats of the people at Springfield; that he made a motion on August 7th, while the board was in session, to proceed to the canvassing of the votes for the county seat; that the votes were then in the hands of the board and looked at, but a motion was made to lay his motion upon the table, which was carried, and no announcement of the vote on county seat was then made; that the board then adjourned to August 9th, but no hour was fixed for the adjourned meeting, as the majority of the board did not want the Springfield people present when the canvass of the votes upon the county seat was made; that Walter I. Harwood, J. M. Wilson and himself, met on the east part of the town site of Springfield on August 9th, at 3 o'clock in the morning, without the official poll-books, ballots or tally-sheets; that they canvassed by moonlight the votes cast upon the permanent location of the county seat of Seward county, and declared Fargo Springs had received 275 votes, and Springfield only 35; the votes cast in the wagon-box at Fargo Springs not being considered or counted. This canvass was subsequently entered upon the journal as the proceedings of the county commissioners, of the date of August 9th. No other canvass or declaration of the result was made, and E. A. Watson, one of the members of the board of county commissioners, was not notified of the time of the meeting of August 9th, and was not present at the meeting.

The official meetings of the county commissioners, whether acting as a board of canvassers or for the transaction of the county business, should be public, and in the office provided therefor. It is also evident that the notice of the hour for convening the moonlight session of the board was intentionally and fraudulently withheld by the other members of the board from the third member. Therefore we think the secret canvass of the votes for the location of the county seat by two

**1. County-seat election; canvass of returns, and declaration of result, void.** commissioners and the county clerk, in the absence of the official returns, and without the presence or any notice to the other commissioner, by moonlight, upon the town site of Springfield, at the early hour of three o'clock A. M., was not only irregular, but wholly invalid. This pretended canvass cannot count for anything. (Comp. Laws of 1879, ch. 25, art. 15, § 211; *P. & F. R. Rly. Co. v. Comm'rs of Anderson Co.*, 16 Kas. 302.)

Whether Fargo Springs or Springfield shall be determined to be the permanent location of the county seat of Seward county, wholly depends upon which of the returns from Seward township are to be counted. The contention is over the votes cast at Fargo Springs, and the question for us to determine is, which of the two polls is legal. It appears that there were cast at the poll known as the "Owl building," a majority of one hundred and thirty-three for Fargo Springs, and at the poll known as the "wagon-box," a majority of two hundred and sixty-three for Springfield. If the "wagon-box" poll is rejected, Fargo Springs is the county seat; if the votes cast at the "wagon-box" be counted, then Springfield has a majority of all the votes cast, and must be declared the county seat.

The act relating to the organization of new counties provides:

"Voters at such elections may assemble at 9 o'clock A. M., in each election precinct; shall select from among themselves three judges and two clerks for the election, who, before they enter upon the discharge of their duties, shall take the oath required by law for judges or inspectors and clerks of election, any one of whom may administer such oath to the others. And the said election shall be governed by the laws regulating elections in force at the time." (Comp. Laws of 1879, ch. 24, § 117.)

It is claimed upon the part of the plaintiff, that a large number of persons in Fargo Springs took possession of the room in the Owl building, designated by the board as the voting-place in Seward township, the night before the election; that they held the same until 8 o'clock the next morn-

16—36 KAS.

ing, with the doors and windows closed, fastened and secured; that previous to that hour they selected the judges and clerks for the election, without giving the voters on the outside, who were there to participate in the election, an opportunity to assist in the selection of the election board.

An examination of the testimony convinces us that there were between forty and fifty men in the Owl building before the polls were opened; that some of them were in the building before 9 o'clock the night before the election, and that all of them were in the building or the room where the election was held by seven o'clock on the morning of August 5th; that the persons in possession of the room in the Owl building where the poll was opened, were there with the intention of preventing those favorable to Springfield as the county seat from participating in the selection of the judges and clerks of the election, and purposely and intentionally excluded the friends of Springfield from having anything whatever to do with the selection of the judges and clerks at the precinct. As to the exact time that the poll in the Owl building was organized, the testimony is conflicting. A very large number of witnesses testified that about two hundred persons arrived at Fargo Springs from six to eight o'clock on the morning of August 5th; that they understood some persons were in the Owl building; that they tried before and up to the time the polls were opened in the room, to get in where the polls were afterward opened, and also saw others try to do the same; that the door was locked, and no one from Springfield got in; that from the time they got there in the morning until the polls opened, it was quiet about the Owl building, the outside doors being locked, the windows shut, and the curtains drawn over the windows, so as to make it dark in the building; that at the time the polls opened, and for some time previous, there was a crowd of from one to two hundred persons on the outside, waiting to participate in the election of the judges and clerks; that most of these were legal voters; that while they were waiting the door of the room opened, and the judges and clerks were elected by the persons on the inside of the room

in the "Owl building," only one or two persons upon the outside voting; that after the room was opened a crowd came out; that the door was then closed and immediately voting commenced on the part of the Fargo Springs people; that the friends of Springfield were then notified that the polls were opened to receive votes. Several witnesses testified that the polls in the "Owl building" were not opened until 9 o'clock, or after.

We think, however, that an examination of all the testimony shows that this poll was prematurely opened. Among the people of Seward county there were three kinds of time — "Central," "Mountain," and "Sun." This largely accounts for the conflicting evidence. Before and after this poll was opened, the voters in favor of Springfield attempted to secure a conference with the friends of Fargo Springs to agree upon an election board that should represent both sides; in this they failed. To the committee appointed in the interest of Springfield to get a representation upon the board, the friends of Fargo Springs said:

"You folks have had the temporary county seat, and we are going to have the board; we will run a square election, but you are not to have any representation on the board."

The voters who were refused participation in the selection of judges and clerks for the election then proceeded at once to select from among themselves three judges and two clerks, and the second poll was opened soon after nine o'clock A. M., in a wagon which had been drawn up very near the room in the "Owl building," designated by the board as the voting-place. In the box upon the wagon, 265 votes were received, while 139 were cast in the "Owl building." Therefore a majority of the electors voted at the second poll, that is, at the wagon-box, and there was an implied recognition by the people of this poll.

Further, all electors coming, up to nine o'clock, had the right to participate in the meeting to select the judges and clerks, to offer motions, to make speeches, and cast votes. The parties who organized the second poll attempted to get into

the room where the first poll was being organized, and attempted to take part with those there present and assist in organizing that poll. At most, only one or two succeeded, although a large number of persons were on the outside of the "Owl building," ready and eager to participate in the meeting. It is evident that the voters on the outside of the building at the time the first poll was organized constituted a majority, and if they had been permitted to participate in organizing the first poll they would have outvoted and carried their motions. The testimony also shows that the parties outside the "Owl building," at the time of organizing the first poll, did not attempt to organize the second poll till they had been refused participation in the meeting previously held, and the organization of the first poll, by excluding the outside voters from participating therein, was manifestly fraudulent. The judges and clerks who were elected and served at the poll in the "Owl building" participated in the organization of the first poll, and also in the exclusion of the voters on the outside of the building.

Upon these facts, we are of the opinion that the second poll, the poll last organized, was the legal poll, and that the votes cast in the wagon-box must be counted, and those received in the "Owl building" rejected. (*Kirkpatrick v. Vickers*, 24 Kas. 314.)

2. First poll, fraudulently organized; second poll, rightfully organized— votes to be canvassed.

The excuse offered in behalf of the parties who organized the poll in the Owl building, that it was necessary to take the action they did in order to have "a full vote and a fair count," on account of the rumors that the friends of Springfield meant to defeat the will of the people by prematurely organizing the polls and receiving illegal votes, does not justify their conduct. The friends of Fargo Springs should have appealed to the law for protection, if they really believed that the laws of the state were about to be transgressed, rather than violate the law in excluding so many legal voters from any opportunity to organize the first poll. We have laws for the preservation of the public peace, and in the execution of that power the magistrates of the state may require persons to give security to keep the peace.

Even if it be conceded that the persons within the Owl building did not organize the polls till 9 o'clock, their conduct is to be severely condemned, because of their excluding from participation in the meeting the voters upon the outside of the building, at the time the meeting was held. Although the southwest room of the building known as the Owl building was designated as the voting-place, the persons both in and on the outside of the room, who were in attendance at the time of organizing the first poll, to participate in the selection of judges and clerks, had equally the same right to offer motions and to vote. Those assembled in the room were not the only ones entitled to vote. There was no trouble in having all participate in the election of judges and clerks, and all of the voters present ought to have been permitted so to do. The vote could have been taken at the door, in the hearing of all.

It is more than probable that all the litigation which has resulted over the legality of the polls organized in Seward township would have been avoided if a majority of the voters present at the polling-place designated had been permitted to select a single representative upon the election board; so, for the trouble which has arisen concerning the legality of the polls in Seward township, the friends of Fargo Springs are responsible.

As the voters favorable to Springfield were denied all opportunity to participate in organizing the election board in the Owl building, and as the second poll was legally organized by a majority of the voters, and as a majority of the votes of the township were cast thereat, and as it further appears that all of the persons voting at such second poll swore in their votes, we must assume, unless the evidence clearly shows to the contrary, that the votes of this poll were legal and legally cast, and therefore authorized to be canvassed. (*Tarbox v. Sughrue*, just decided.)

A peremptory writ of mandamus will issue, as prayed for in the petition, requiring the defendants to meet with E. A. Watson and canvass the returns of the election held August

5, 1886; for the permanent location of the county seat of Seward county; and in making such canvass the defendants are commanded to reject the returns transmitted to them from the poll known as the "Owl building," and to canvass the returns from the "wagon-box" poll. Judgment is also rendered against the defendants for all costs.

All the Justices concurring.